**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **VONDA K. PILKENTON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv00010 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Vonda K. Pilkenton, ("Pilkenton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pilkenton protectively filed an application for DIB on January 11, 2012, alleging disability as of December 7, 2011, due to fibromyalgia; degenerative disc disease; arthritis; bulging discs; neck spurs; hypothyroidism; acid reflux disease; hernia; ulcers; carpal tunnel in the right hand; neuropathy; depression; and anxiety. (Record, ("R."), at 170-73, 190, 232.) The claim was denied initially and on reconsideration. (R. at 86-88, 92-94, 97-100, 102-104.) Pilkenton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 105-06.) A hearing was held on September 6, 2013, at which Pilkenton was represented by counsel. (R. at 26-59.)

By decision dated January 2, 2014, the ALJ denied Pilkenton's claim. (R. at 9-25.) The ALJ found that Pilkenton meets the nondisability insured status requirements of the Act for DIB purposes through June 30, 2017. (R. at 11.) The ALJ also found that Pilkenton had not engaged in substantial gainful activity since December 7, 2011, her alleged onset date.[1] (R. at 11.) The ALJ found that the

---

[1] Therefore, Pilkenton must show that she became disabled between December 7, 2011, the alleged onset date, and January 2, 2014, the date of the ALJ's decision, in order to be entitled to DIB benefits.

medical evidence established that Pilkenton suffered from severe impairments, namely chronic pain disorder; generalized osteoarthritis; diagnosed fibromyalgia; cervical spine arthritis; history of carpal tunnel syndrome with release procedures bilaterally; depressive and anxiety disorders; and borderline intellectual functioning, but he found that Pilkenton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 11-12.) The ALJ found that Pilkenton had the residual functional capacity to perform sedentary work[2] that did not require more than occasional climbing, balancing, kneeling, crouching, crawling, stooping and overhead reaching; that did not require more than frequent reaching in all other directions, fingering and handling; that allowed her to shift positions in place at the work station; that did not require more than short, simple instructions; that did not involve interaction with the public; and that required no more than brief interaction with others throughout the workday, lasting no more than one to three minutes at a time. (R. at 14.) The ALJ found that Pilkenton was unable to perform her past relevant work. (R. at 23.) Based on Pilkenton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Pilkenton could perform, including jobs as a night cleaner and mail routing clerk. (R. at 23-24.) Thus, the ALJ found that Pilkenton was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R.

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

§ 404.1520(g) (2015).

After the ALJ issued his decision, Pilkenton pursued her administrative appeals, (R. at 272-75), but the Appeals Council denied her request for review. (R. at 1-4.) Pilkenton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Pilkenton's motion for summary judgment filed December 31, 2015, and the Commissioner's motion for summary judgment filed February 2, 2016.

## II. Facts

Pilkenton was born in 1964, (R. at 170), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). Pilkenton obtained her general equivalency development, ("GED"), diploma. (R. at 31, 191.) She has past work experience as a telephone representative, a supervisor for a call center and a deli worker. (R. at 36, 49.) Pilkenton stated that the medication she took for arthritis, fibromyalgia and panic attacks gave her "some relief," but that she continued to experience pain. (R. at 34-35, 45.) She stated that her medication caused drowsiness and an inability to concentrate. (R. at 38.) Pilkenton stated that she participated in counseling and that it was "somewhat" helpful. (R. at 40.) She stated that she worked on crafts for a couple of hours once a week, including quilting. (R. at 42.)

Vocational expert, Asheley Wells, also testified at Pilkenton's hearing. (R. at 49-56.) Wells classified Pilkenton's work as a telephone representative as

sedentary and semi-skilled, her work as a deli worker as medium[3] and unskilled and her work as a chief telephone operator as sedentary and skilled. (R. at 49.) Wells was asked to consider a hypothetical individual of Pilkenton's age, education and work experience, who would be limited to sedentary work that did not require more than occasional stooping; kneeling; crouching; climbing of steps; and overhead reaching; that did not require her to perform constant reaching, handling or fingering; that would require only short, simple instructions; and that did not require more than limited interaction with the public, co-workers and supervisors. (R. at 50-51.) Wells stated that such an individual could perform Pilkenton's past work as a telephone representative. (R. at 50.) Wells stated that the individual also could perform other jobs existing in significant numbers in the national economy, including those of an inspector, tester and sorter; a peanuts worker; an assembler; a production helper; and an almond blancher. (R. at 51.) Wells was asked to consider the same individual, but who would be limited to occasional handling and fingering. (R. at 52.) He stated that there would be no jobs available that such an individual could perform. (R. at 52.)

Wells was asked to consider a hypothetical individual of Pilkenton's age, education and work experience, who could sit up to two hours in an eight-hour workday, but no more than 30 minutes at a time; who could stand and/or walk up to eight hours, if given the opportunity for brief hourly position changes; who had no manipulative limitations; who could perform only frequent reaching, handling and fingering; and who would require only limited interaction with co-workers and

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2015).

supervisors. (R. at 53-55.) Wells stated that there were light[4] jobs available that such an individual could perform, including jobs as a night cleaner and a mail routing clerk. (R. at 53-54.) Wells stated that the jobs identified would not be available should the hypothetical individual be limited to occasional handling and fingering. (R. at 56.) He also stated that there would be no jobs available that an individual could perform should she have an inability to deal with work stresses. (R. at 56.)

In rendering his decision, the ALJ reviewed medical records from Wise County Public Schools; Dr. David Sheppard, D.O.; Norton Community Hospital; Anthony E. Holt, D.O., a neurologist; Dr. Maurice E. Nida, D.O.; Christina K. Hammonds, N.P., a nurse practitioner; Dr. David C. Williams, M.D., a state agency physician; Patricia Bruner, Ph.D., a state agency psychologist; Dr. Bruce M. Miller, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Anne B. Jacobe, L.C.S.W., a licensed clinical social worker with Solutions Counseling; Janet S. Elswick, F.N.P., a family nurse practitioner; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Phil Pack, M.S. Pilkenton's attorney also submitted medical records from The Health Wagon; Jacobe; and Dr. Nida to the Appeals Council.[5]

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-4), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

The record shows that Dr. David Sheppard, D.O., treated Pilkenton from 2005 through 2009 for numbness; paresthesia; gastroesophageal reflux disease, ("GERD"); leg edema; cervical disc disease; questionable fibromyalgia; osteoarthritis; carpal tunnel syndrome; neuropathy; multinodular goiter; anxiety; hypothyroidism; back pain; fatigue; arthralgias; degenerative joint disease; depression; questionable gout/foot pain; hiatal hernia; and palpitations. (R. at 424-86.) On February 13, 2007, Pilkenton complained of back pain. (R. at 450.) X-rays of Pilkenton's lumbar spine showed mild degenerative change and disc space narrowing. (R. at 411.) Dr. Sheppard diagnosed lumbar strain and radiculopathy. (R. at 450.) On April 3, 2007, an ultrasound of Pilkenton's thyroid showed hypoechoic nodules in both lobes of the gland, which likely were degenerating colloid nodules. (R. at 412.) On October 1, 2007, Pilkenton complained of pain all over. (R. at 444.) She stated that she had to leave work because of the pain, and she had not returned to work. (R. at 444.) Physical examination was normal. (R. at 444.) On January 19, 2009, Pilkenton complained of neck pain. (R. at 428-29.) Examination revealed pain with palpation over the paraspinal muscles in the left cervical neck region; normal muscle strength in the upper and lower extremities; and deep tendon reflexes were 2/4 bilaterally. (R. at 428.) X-rays of Pilkenton's cervical spine showed mild spondylitic degenerative change. (R. at 422.) Dr. Sheppard diagnosed cervical pain. (R. at 428.) On March 2, 2009, Pilkenton reported that she was doing much better since participating in physical therapy and using her medication. (R. at 424.) Examination was normal, including the finding of no gross joint deformities; full range of motion of all extremities; no clubbing, cyanosis or edema; and pedal pulses were 2/4 bilaterally. (R. at 424.)

-7-

On June 11, 2008, Pilkenton was admitted to Norton Community Hospital for complaints of chest pain. (R. at 414-19.) An echocardiogram showed a normal left ventricular size and systolic function with estimated ejection fraction of 60 to 65 percent and trace mitral and tricuspid regurgitation. (R. at 416-17.) She was discharged the next day with a diagnosis of chest pain due to phentermine use. (R. at 414.)

On July 15, 2008, Pilkenton saw Dr. Anthony E. Holt, D.O., a neurologist, for complaints of left upper extremity pain and weakness, neck pain and neuropathy in the feet. (R. at 391-92.) Dr. Holt diagnosed polyneuropathy,[6] left arm pain and disturbance of sensation. (R. at 391.) On August 5, 2008, a nerve conduction study showed evidence of a mild median neuropathy localized to the left wrist. (R. at 394-96.) An electromyographic, ("EMG"), needle examination was normal. (R. at 396.) On September 16, 2008, Pilkenton complained of paresthesias and dysesthesias in both feet and left arm pain; however, she reported improvement with medication. (R. at 388.) Dr. Holt diagnosed polyneuropathy, most likely small fiber neuropathy; median neuropathy of the left wrist; paresthesias; and dysesthesias. (R. at 387.)

On May 12, 2009, Dr. Maurice E. Nida, D.O., saw Pilkenton as a new patient for her complaints of a goiter and hypothyroidism. (R. at 285-86.) Dr. Nida diagnosed probable fibromyalgia; thyroid goiter; hypothyroidism; neuropathy; and carpal tunnel syndrome. (R. at 286.) On May 21, 2009, an MRI of Pilkenton's

---

[6] Polyneuropathy is defined as a generalized disorder of peripheral nerves. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 657 (1995).

-8-

cervical spine showed moderately severe C5-6 spondylosis with combination disc producing mild impression on the anterior margin of the thecal sac and cord and narrowing of the left lateral recess. (R. at 287-88.) On September 17, 2009, Pilkenton reported that she was doing fairly well. (R. at 283.) On January 21, 2010, Pilkenton complained of a lot of muscle pain. (R. at 281.) Dr. Nida reported a normal physical examination. (R. at 281.) On July 21, 2010, Pilkenton reported that she was doing fairly well. (R. at 280.) She reported that her transcutaneous electrical nerve stimulation, ("TENS"), unit helped with her fibromyalgia pain. (R. at 280.) Dr. Nida reported a normal physical examination. (R. at 280.) On October 18, 2010, Pilkenton reported that she was doing fairly well. (R. at 278.) On October 28, 2010, Pilkenton complained of anxiety and depression. (R. at 277.)

On May 13, 2011, Pilkenton reported that she was doing well. (R. at 306.) Pilkenton's physical examination was reported as normal. (R. at 306.) On August 18, 2011, Pilkenton complained of fibromyalgia pain and neck, shoulder and back pain with radiculopathy, resulting from "direct trauma and a fall." (R. at 302.) Dr. Nida noted that Pilkenton had three bulging discs and spurs in her cervical spine. (R. at 302.) Radiculopathy was noted in Pilkenton's left arm. (R. at 302.) Examination showed widespread trigger tender points in Pilkenton's back, legs and arm, as well as tenderness in her left ankle with decreased pulses. (R. at 304.) On September 28, 2011, Pilkenton saw Christina K. Hammonds, N.P., a nurse practitioner, for complaints of panic attacks. (R. at 299.) Pilkenton stated that the panic attacks occurred daily and lasted for hours. (R. at 299.) Hammonds noted that Pilkenton's mood and affect were anxious and tearful. (R. at 301.) Pilkenton reported that her symptoms of anxiety were fairly controlled. (R. at 299.)

-9-

Pilkenton's examination was normal. (R. at 300-01.) On October 28, 2011, Pilkenton reported that her anxiety symptoms had improved and that she felt "a lot better." (R. at 296.) She also reported that she had good symptom control of her depression. (R. at 296.) Hammonds reported that Pilkenton's examination was normal. (R. at 297-98.) On December 8, 2011, Pilkenton reported that she experienced panic attacks daily. (R. at 291.) She stated that she had a lot of stress at home with her family and was unable to work because she could not concentrate. (R. at 291.) Pilkenton reported that her pain and symptoms of depression were relieved with medication. (R. at 291.) She stated that her symptoms of anxiety were improving. (R. at 291.) Pilkenton's examination was reported as normal. (R. at 292-93.)

On January 31, 2012, Dr. Nida completed a mental assessment, indicating that Pilkenton had a limited, but satisfactory, ability to use judgment; to function independently; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 326-28.) Dr. Nida opined that Pilkenton had a seriously limited ability to follow work rules; to relate to co-workers; to interact with supervisors; and to understand, remember and carry out complex and detailed job instructions. (R. at 326-27.) He found that Pilkenton had no useful ability to deal with the public; to deal with work stresses; and to maintain attention and concentration. (R. at 326.) He noted that it was "unknown" the number of days that Pilkenton would be expected to be absent from work due to her impairments. (R. at 328.)

-10-

Also on January 31, 2012, Dr. Nida completed a medical assessment, indicating that Pilkenton could occasionally lift and carry items that weighed "very little" and that she could frequently lift and carry items up to one-third of an eight-hour workday. (R. at 376-78.) He opined that Pilkenton could stand and walk up to eight hours in an eight-hour workday and that she could do so for up to one hour without interruption. (R. at 376.) He opined that Pilkenton could sit up to two hours in an eight-hour workday and that she could do so for up to 30 minutes without interruption. (R. at 377.) Dr. Nida opined that Pilkenton could occasionally climb, stoop, kneel, balance and crawl and crouch "very little." (R. at 377.) Dr. Nida reported that Pilkenton's abilities to reach, to handle and to push and pull were affected by her impairments. (R. at 377.) He opined that Pilkenton was restricted from working around heights, moving machinery, temperature extremes, noise and vibration. (R. at 378.) Dr. Nida noted that it was "unknown" as to how many days a month that Pilkenton would be absent from work as a result of her impairments. (R. at 378.)

On March 13, 2012, Pilkenton reported that she felt well and voiced no complaints. (R. at 321.) She reported that her symptoms of depression were relieved by medication. (R. at 321.) Pilkenton stated that her anxiety was improving and that she had fair symptom control. (R. at 321.) Hammonds reported that Pilkenton had poor symptom control of her fibromyalgia. (R. at 321.) Pilkenton stated that she experienced right shoulder pain, which was aggravated by physical activity and overhead activity. (R. at 321.) She stated that she was on medication for her fibromyalgia around the clock, which kept her from being able to function at work. (R. at 321.) Hammonds reported that Pilkenton's mood and

-11-

affect were anxious, and she exhibited multiple areas of trigger point tenderness. (R. at 323.) On July 19, 2012, Pilkenton reported that her symptoms of depression, panic attacks, anxiety and fibromyalgia were controlled with medication. (R. at 357.) On September 27, 2012, Pilkenton reported that her symptoms of fibromyalgia and anxiety were controlled with medication. (R. at 353.) Physical examination was normal, with the exception of tenderness in Pilkenton's left shoulder. (R. at 355.)

On January 24, 2013, Pilkenton reported that her anxiety was moderate in severity, but that her symptoms were improving with medication. (R. at 350.) She reported that she was feeling well and was able to perform her activities of daily living. (R. at 350.) Pilkenton reported that her symptoms of fibromyalgia and depression were relieved by medication. (R. at 350.) On September 17, 2013, Pilkenton reported that her symptoms of fibromyalgia occurred intermittently. (R. at 621.) She reported that her anxiety symptoms were relieved by medication. (R. at 621.) Dr. Nida noted that Pilkenton's physical examination was normal, with the exception of tenderness in her left shoulder and tenderness to palpation of her left elbow. (R. at 622.)

On March 7, 2012, Dr. David C. Williams, M.D., a state agency physician, reported that Pilkenton had the residual functional capacity to perform medium[7] work. (R. at 65-66.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 66.)

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2015).

-12-

On March 8, 2012, Patricia Bruner, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Pilkenton suffered from an affective disorder and anxiety-related disorders. (R. at 63-64.) She found that Pilkenton had mild limitations on her ability to perform her activities of daily living, to maintain social functioning and to maintain concentration, persistence or pace. (R. at 63-64.) Bruner found that Pilkenton had not experienced any episodes of decompensation of extended duration. (R. at 64.) Bruner noted that Pilkenton's ability to function was not significantly impaired by her mental health issues as long as she remained compliant with treatment. (R. at 64.)

Pilkenton underwent a right endoscopic carpal tunnel release on June 8, 2012.[8] (R. at 343.) She was seen for follow up on June 19, 2012, by Dr. Bruce M. Miller, M.D. (R. at 342.) At that time, Pilkenton had no complaints and reported that her numbness and tingling had resolved. (R. at 342.) Examination revealed radial, median and ulnar nerves to be intact to motor and sensory. (R. at 342.) She had excellent grip and full range of motion. (R. at 342.)

On June 12, 2012, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF, indicating that Pilkenton suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 75-76.) She found that Pilkenton had mild limitations on her ability to perform her activities of daily living, to maintain social functioning and to maintain concentration, persistence or pace. (R. at 75.) Jennings found that Pilkenton had not experienced any episodes of

---

[8] Pilkenton underwent a left endoscopic carpal tunnel release in July 2009. (R. at 345.)

decompensation of extended duration. (R. at 75.)

On June 13, 2012, Dr. Michael Hartman, M.D., a state agency physician, reported that Pilkenton had the residual functional capacity to perform medium work. (R. at 77-78.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 77-78.)

On June 13, 2012, Pilkenton began counseling with Anne B. Jacobe, L.C.S.W., a licensed clinical social worker with Solutions Counseling. (R. at 330.) The record shows that Pilkenton continued to see Jacobe through December 2013. (R. at 330-36, 361-73, 384-85, 488.) Pilkenton reported having significant financial concerns, conflict with her son and pain. (R. at 330-36, 361-73.) During this time, Pilkenton's depression and anxiety were described as moderate to severe. (R. at 330-36, 361-67, 369-73, 384-85, 488, 602-04.) Her thought processes were described as "racing" and "slowed," and she had fair judgment and insight. (R. at 330-36, 361-67, 369-73, 384-85, 488, 602-04.) Pilkenton was diagnosed with major depressive disorder. (R. at 330.)

On September 12, 2012, Jacobe completed a mental assessment, indicating that Pilkenton had a limited, but satisfactory, ability to follow work rules; to interact with supervisors; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 338-40.) She opined that Pilkenton had a seriously limited ability to relate to co-workers; to use judgment; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; and to demonstrate reliability.

-14-

(R. at 338-39.) Jacobe found that Pilkenton had no useful ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 338-39.) She opined that Pilkenton would be absent from work more than two days a month. (R. at 340.)

In April 2013, Pilkenton considered herself "spread too thin," caring for her mother and grandchildren. (R. at 361.) On July 23, 2013, Jacobe completed a mental assessment, indicating that Pilkenton had a limited, but satisfactory, ability to follow work rules; to interact with supervisors; to maintain personal appearance; and to demonstrate reliability. (R. at 380-82.) She opined that Pilkenton had a seriously limited ability to relate to co-workers; to use judgment; to function independently; to understand, remember and carry out simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 380-81.) Jacobe found that Pilkenton had no useful ability to deal with the public; to deal with work stresses; to maintain attention and concentration; and to understand, remember and carry out complex and detailed job instructions. (R. at 380-81.) She opined that Pilkenton would be absent from work more than two days a month. (R. at 382.)

On January 23, 2014, Jacobe completed a mental assessment, indicating that Pilkenton had a limited, but satisfactory, ability to follow work rules. (R. at 625-27.) She opined that Pilkenton had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to understand, remember and carry out simple job

-15-

instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 625-26.) Jacobe found that Pilkenton had no useful ability to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 625-26.) She opined that Pilkenton would be absent from work more than two days a month. (R. at 627.)

On May 23, 2013, Pilkenton visited The Health Wagon for the first time. (R. at 496-98.) She reported hypothyroidism and cervicalgia, but an examination of her neck was supple with no lymphadenopathy. (R. at 496-97.) Pilkenton's lungs were clear, and examination of her spine was normal. (R. at 497.) She was advised not to lift or to participate in any activity that would cause additional neck injury. (R. at 497.) On June 6, 2013, Pilkenton reported cervical pain which radiated into her arms. (R. at 492-93.) Pilkenton had a reduced range of motion of the cervical spine. (R. at 492.) Examination of Pilkenton's spine was normal. (R. at 492.) Her neck was supple with no lymphadenopathy. (R. at 492.) Janet S. Elswick, F.N.P., a family nurse practitioner, diagnosed hypothyroidism, cervicalgia, anxiety, depression and a goiter. (R. at 492.) On June 24, 2013, while receiving treatment for fever blister, an examination of Pilkenton's neck was supple with full motion and no lymphadenopathy. (R. at 490.)

On August 12, 2013, Elswick completed a medical assessment, indicating that Pilkenton could occasionally lift and carry items weighing up to 25 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 504-06.) She indicated that Pilkenton could stand and walk two to three hours in an eight-hour

workday and that she could do so for 15 to 20 minutes without interruption. (R. at 504.) Elswick indicated that Pilkenton could sit for two to three hours in an eight-hour workday and that she could do so for up to 30 minutes without interruption. (R. at 505.) Elswick opined that Pilkenton could occasionally climb, stoop, kneel, balance and crouch and never crawl. (R. at 505.) She opined that Pilkenton's abilities to reach, to handle, to feel and to push and pull were affected by her impairments. (R. at 505.) Elswick noted that Pilkenton was restricted from working around heights, temperature extremes, noise and vibration. (R. at 506.) She opined that Pilkenton would be absent from work more than two days a month. (R. at 506.) Elswick also noted that Pilkenton had not been seen since May 23, 2013, which made it difficult to accurately complete the assessment. (R. at 506.)

That same day, Elswick also completed a mental assessment, indicating that Pilkenton had a limited, but satisfactory, ability to follow work rules; to relate to co-workers; to use judgment; to interact with supervisors; to understand, remember and carry out detailed and simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to demonstrate reliability. (R. at 508-10.) She opined that Pilkenton had a seriously limited ability to function independently and to relate predictably in social situations. (R. at 508-09.) Elswick found that Pilkenton had no useful ability to deal with the public; to deal with work stresses; to maintain attention and concentration; and to understand, remember and carry out complex job instructions.[9] (R. at 508-09.) She opined that

---

[9] Elswick found that Pilkenton had no useful ability to deal with the pubic and to deal with work stresses. (R. at 508.) It appears that Elswick's findings concerning these two areas of occupational adjustments were based on Pilkenton's statements. (R. at 508.) With regard to Pilkenton's inability to deal with the public, Elswick noted that, "patient states she avoids

-17-

Pilkenton would be absent from work more than two days a month due to her impairments. (R. at 510.) Again, Elswick also noted that Pilkenton had not been seen since May 23, 2013, which made it difficult to accurately complete the assessment. (R. at 510.)

On August 15, 2013, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Pilkenton at the request of Pilkenton's attorney. (R. at 512-21.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Pilkenton obtained a full-scale IQ score of 75. (R. at 513.) Lanthorn reported that Pilkenton exhibited no signs of ongoing psychotic processes, delusional thinking or hallucinations. (R. at 516.) Pilkenton reported that she cried occasionally; was frequently irritable; had erratic to poor concentration; had ongoing anxiety; and experienced two panic attacks a month. (R. at 517.) The Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), was administered, indicating that Pilkenton had concentration difficulties. (R. at 519-20.) Lanthorn diagnosed major depressive disorder, recurrent, moderate; dysthymic disorder, late onset; panic disorder without agoraphobia; and borderline intellectual functioning. (R. at 520.)  Lanthorn assessed Pilkenton's then-current Global Assessment of Functioning, ("GAF"),[10] score at 55.[11] (R. at 521.)

---

public." (R. at 508.) With regard to Pilkenton's inability to deal with work stresses, Elswick noted that Pilkenton reported that she had "no patience." (R. at 508.)

[10] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[11] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ...  OR

-18-

Lanthorn completed a mental assessment, indicating that Pilkenton had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 523-25.) He found that Pilkenton had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to demonstrate reliability. (R. at 523-24.) Lanthorn opined that Pilkenton had no useful ability to understand, remember and carry out complex job instructions and to relate predictably in social situations. (R. at 524.) He found that Pilkenton would be absent from work more than two days a month. (R. at 525.)

On September 28, 2013, Phil Pack, M.S., a licensed psychological practitioner, evaluated Pilkenton at the request of Disability Determination Services. (R. at 573-78.) Pack diagnosed dysthymic disorder; anxiety disorder, not otherwise specified; and personality disorder, not otherwise specified. (R. at 577.) He assessed Pilkenton's then-current GAF score at 60. (R. at 577.) Pack opined that Pilkenton had an unlimited ability to understand straightforward direction and instruction, as she did not present with deficits in her cognitive or memory functions. (R. at 577.) He noted that Pilkenton's ability to complete a typical work week without disruption from psychiatric issues was deemed as "fair." (R. at 577.) Pack reported that Pilkenton's abilities to secure and arrange travel, to live independently and to attend to her personal needs were deemed as "good." (R. at

---

moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

-19-

577.)

On November 3, 2013, Pack completed a mental assessment, indicating that Pilkenton's ability to understand, remember and carry out instructions was not affected by her impairments. (R. at 592-94.) Pack reported that Pilkenton was not limited in her ability to interact appropriately with supervisors. (R. at 593.) He found that Pilkenton had mild limitations in her ability to interact appropriately with the public and with co-workers and was moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 593.)

On October 18, 2013, Dr. Saeed Jadali, M.D., examined Pilkenton at the request of Disability Determination Services. (R. at 580-85.) Dr. Jadali reported that Pilkenton had normal muscle tone and strength; normal gait; normal and symmetric reflexes; normal sensation; finger-to-nose normal; negative Romberg test; no tremors or rigidity was noted; cranial nerves were intact; normal strength and grip; normal upper and lower extremity strength, sensation and reflexes; and negative straight leg raising tests. (R. at 584.) Dr. Jadali diagnosed fibromyalgia; chronic pain disorder; hypothyroidism; and degenerative joint disease. (R. at 584.)

Dr. Jadali completed a medical source statement, indicating that Pilkenton could continuously lift items weighing up to 20 pounds; frequently carry items weighing up to 20 pounds; and occasionally lift and carry items weighing up to 50 pounds. (R. at 586-91.) He opined that Pilkenton could sit, stand and walk a total of six hours in an eight-hour workday and that she could do so for up to two hours

without interruption. (R. at 587.) Dr. Jadali reported that Pilkenton could continuously reach overhead and in all directions; handle; finger; feel; push and pull; and operate foot controls. (R. at 588.) He reported that Pilkenton could occasionally crawl; frequently climb stairs, ramps, ladders and scaffolds, kneel and crouch; and continuously balance and stoop. (R. at 589.) Dr. Jadali reported that Pilkenton could occasionally work around dust, odors, fumes and pulmonary irritants, extreme cold and heat, vibration and moderate noise and frequently work around unprotected heights, moving machinery, operation of a vehicle and humidity and wetness. (R. at 590.) He found that Pilkenton could take care of her personal needs. (R. at 591.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.

The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Pilkenton argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Pilkenton further argues that the ALJ erred by relying on the post-hearing reports of consulting evaluators without granting her the right to cross-examine the evaluators. (Plaintiff's Brief at 5-6.)

The ALJ found that Pilkenton had the residual functional capacity to perform sedentary work that did not require more than occasional climbing, balancing, kneeling, crouching, crawling, stooping and overhead reaching; that did not require more than frequent reaching in all other directions, fingering and handling; that allowed her to shift positions in place at the work station; that did not require more than short, simple instructions; that did not involve interaction with the public; and that required no more than brief interaction with others throughout the workday, lasting no more than one to three minutes at a time. (R. at 14.)

It is the ALJ's responsibility to weigh the evidence, including the medical

-22-

evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding that there are a significant number of jobs that exist in the national economy that Pilkenton could perform. The ALJ found that Pilkenton had the residual functional capacity to perform a limited range of sedentary work. (R. at 14.) While the ALJ found that Pilkenton could not perform any of her past relevant work, he found that she could perform other jobs that existed in significant numbers in the national economy, such as a night cleaner and a mail routing clerk. (R. at 23-24.) Based upon the vocational expert's testimony, however, the jobs of a night cleaner and a mail routing clerk are classified as light work. (R. at 53-54.) Therefore, the vocational expert's testimony does not support the ALJ's finding.

Pilkenton argues that the ALJ erred by relying on the post-hearing reports of consulting evaluators without granting her the right to cross-examine the evaluators. (Plaintiff's Brief at 5-6.) I find this argument unpersuasive. The ALJ sent a proffer letter dated November 5, 2013, to Jason A. Mullins, counsel for

-23-

Pilkenton, with a copy to Pilkenton, apprising them of the new evidence. (R. at 266-67.) Based on my review of the letter, it comports with the requirements to be deemed a proffer letter, as set forth in HALLEX I-2-7-30:

- A time limit to object to, comment on, or refute the proffered evidence, and to submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted;
- A time limit to submit written questions to the author(s) of the proffered evidence;
- When applicable (see HALLEX I-2-7-1), an opportunity to request a supplemental hearing, including the opportunity to cross-examine the author(s) of any posthearing evidence; and
- The opportunity and instructions for requesting a subpoena for the attendance of witnesses or the submission of records.

Based on this, I find that substantial evidence does not exist to support Pilkenton's argument that the ALJ erred by failing to grant her the right to cross-examine Pack and Dr. Jadali.

Based on the above reasoning, I further find that substantial evidence does not exist in the record to support the ALJ's finding that Pilkenton was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: July 14, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-24-